**PHILIP L. GREGORY** (SBN 95217)
**GREGORY LAW GROUP**
1250 Godetia Drive
Woodside, CA 94062
Telephone:     (650) 278-2957
Fax:     By Request
pgregory@gregorylawgroup.com

**JOSEPH M. BRUNO** (*pro hac vice* pending)
**BRUNO & BRUNO, L.L.P.**
855 Baronne Street
New Orleans, LA 70113
Telephone: (504) 564-7366
Fax: 504-581-1493
jbruno@brunobrunolaw.com

**DERRIEL C. MCCORVEY** (*pro hac vice* pending)
**McCORVEY LAW, LLC**
102 Versailles Blvd. Ste 620
Lafayette, LA 70501
Telephone: 337-291-2431
Fax: 337-291-2433
derriel@mccorveylaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **ORGANIC PANACEAS, LLC**, *et al.*, | **CASE NO.** |
| Plaintiffs, | **CLASS ACTION ANTITRUST COMPLAINT** |
| v. | |
| **GOOGLE, LLC, and ALPHABET INC.**, | |
| Defendants. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................ 1

II.     JURISDICTION ................................................................................................. 10

III.    PARTIES ........................................................................................................... 11

        A.  Plaintiff ................................................................................................. 11

        B.  Defendants ........................................................................................... 14

IV.     FACTUAL ALLEGATIONS ............................................................................ 15

        A.  Search Engines, Search Advertising, and General Search Text Advertising ... 15

        B.  Overview of Digital Advertising ......................................................... 21

        C.  Google Used Its Market Power to Acquire and Maintain a Monopoly for
            Display Advertising Services ............................................................... 23

V.      INTERSTATE TRADE AND COMMERCE ..................................................... 32

VI.     ANTITRUST IMPACT ...................................................................................... 32

VII.    CLASS ACTION ALLEGATIONS ................................................................... 32

VIII.   CAUSE OF ACTION ........................................................................................ 34

        VIOLATIONS OF THE SHERMAN ANTITRUST ACT 15 U.S.C. § 2 ............ 34

IX.     PRAYER FOR RELIEF ..................................................................................... 35

X.      DEMAND FOR JURY TRIAL .......................................................................... 36

Plaintiff, Organic Panaceas, LLC, on behalf of itself and all other similarly situated entities, brings this Class Action Complaint for equitable relief and treble damages under the Sherman Antitrust Act, 15 U.S.C. § 2, and for all other equitable relief due under the circumstances. Plaintiff respectfully represents and alleges that:

## I.      NATURE OF THE ACTION

1.      Forty-nine state attorneys general are currently conducting antitrust investigations of Google's conduct in digital advertising markets. The United States Department of Justice and eleven state attorneys general recently filed a civil antitrust action against Google for unlawfully maintaining monopolies, *inter alia*, in the markets for online search and search advertising.

2.      Google's digital advertising exchange is but one example of how Google unlawfully maintained a monopoly in the market for online search advertising. As the Wall Street Journal wrote on April 11, 2021, in an article entitled "*Secret Google Project Accused Of Using Ad Data to Lift Sales*": "Google for years operated a secret program that used data from past bids in the company's digital advertising exchange to allegedly give its own ad-buying system an advantage over competitors, according to court documents filed in a Texas antitrust lawsuit. The program, known as 'Project Bernanke,' wasn't disclosed to publishers who sold ads through Google's ad-buying systems. It generated hundreds of millions of dollars in revenue for the company annually, the documents show. In its lawsuit, Texas alleges that the project gave Google, a unit of Alphabet Inc., an unfair competitive advantage over rivals."

3.      Online ads are typically sold in auctions that happen in an instant, when a user's webpage is loading. For over a decade, Google has come to dominate the market for digital ads, beginning with its acquisition of the ad-technology firm DoubleClick in 2008. Google dominates the market for online search advertising at virtually every step of the process. Google's "digital advertising machine" works as follows:

      a.   An advertiser, representing its clients' products or services, uses sophisticated buying tools to purchase ads, most often Google's buying tool, DV360, the industry leader. The advertiser specifies the types of audiences it wants to target—such as location, gender or age of user—and the price of their offer.

b.  When a user visits a large online publisher's website or app, the publisher uses an ad server to sell ad space on its pages. The publisher also gives the exchange information about the user, such as their age, income, browsing history, and interests. Often, a publisher will use Google's DoubleClick for Publishers, the leading ad-serving tool. The tool puts the publisher's ad space up for sale on exchanges, marketplaces where transactions happen in real-time between sellers (publishers) and buyers (advertisers). Google has the largest real time auction house marketplace, the DoubleClick Ad Exchange, or AdX.

c.  To get its ad in front of the user, the advertiser places bids in the auction marketplace—the highest bidder wins.

d.  Once a match is made on the exchange, an ad pops up on the user's screen.

4.  Google operates the leading online selling and buying tools, as well as the biggest marketplace where online ad deals happen. Because Google serves as both the operator of the major digital ad exchange and the representative of buyers and sellers on the digital ad exchange, Google operates a digital-ad monopoly that harms purchasers of digital ads (like Plaintiff), ad-industry competitors, and publishers. To further complicate matters, Google also acts as an ad buyer in its own right, selling ads on its own properties such as search and YouTube through these same systems. As Google Chief Economist Hal Varian said at a 2019 antitrust conference held by the University of Chicago Booth School of Business: "we're on both the buy side and the sell side."

5.  As alleged in the Texas antitrust case, Google used its access to data from publishers' ad servers—where more than 90% of large publishers use Google to sell their digital ad space—to guide advertisers toward the price they would have to bid to secure an ad placement. Google's exclusive use of this bidding information (what ad buyers were willing to pay) gives it a competitive advantage in digital-ad markets because Google was able to monopolize the market for digital ad exchange.

6.  Google has monopoly power because Google owns the dominant tool at every link in the complex chain between online publishers and advertisers, giving it unique power over the monetization of digital content. It also owns key platforms for reaching consumers, such as

1   YouTube, enabling Google to leverage its power in one part of the advertising chain to force

2   publishers or advertisers to use another Google-owned tool. Using Google's DoubleClick for

3   Publishers is the only way to get full access to Google's AdX exchange. A major reason why

4   access to AdX (among all major exchanges) is crucial is because AdX connects to another

5   powerful Google product, AdWords, which draws on the company's dominance in search.

6        7.      The market for digital ad exchange is dominated by Google-created systems rife

7   with conflicts of interest, in which it used its superior data advantage and dominant position in

8   the marketplace to give preference to its own tools and steer money to its own properties. These

9   added costs have resulted in damage to small businesses, like Plaintiff, higher prices and

10  exclusionary conduct, making it harder for consumers like Plaintiff to use alternative ad

11  technologies on their web pages.

12       8.      To understand how small American businesses like Plaintiff have been directly

13  damaged by Google's anticompetitive conduct, it is important to understand the market for

14  digital ad exchange, how online ads are typically bought and sold, as more fully set forth below.

15       9.      When a user visits a web page with the user's browser, a complex process of

16  content selection and delivery begins. An advertiser might have its advertising placed on a web

17  site using a real time online bidding system using a demand-side platform. A demand-side

18  platform ("DSP") is a system that allows buyers of digital advertising inventory to manage

19  multiple ad exchange and data exchange accounts through one interface. Real-time bidding for

20  displaying online advertising takes place within the ad exchanges.

21       10.     An ad exchange is a technology platform that facilitates the buying and selling of

22  online advertising inventory from multiple ad networks. Prices for the inventory are determined

23  through real-time bidding ("RTB"). The approach is technology-driven as opposed to the

24  historical approach of negotiating price on media inventory.

25       11.     The process begins when the user visits the publisher's webpage. The publisher's

26  webpage typically uses content to draw an audience and the publisher sells ad space to

27  advertisers who want to display advertising to the user. Once the search engine brings the user to

28  the publisher's server which then assembles content for the webpage to be viewed by the user. At

    that point, the browser further provides the opportunity to display an ad. The browser is told

**CLASS ACTION ANTITRUST COMPLAINT**                                          3

where to go to retrieve ad content. The publisher has an ad server that uses logic to choose what happens next.

12.     Like shares sold on a stock exchange, if the ad space is not reserved by a specific advertiser, the publisher's ad server puts the opportunity out to bid by connecting to a supply-side platform ("SSP"), which allows the publisher to monetize the ad inventory of an ad network. Examples of ad networks are Microsoft media network and advertising.com.

13.     The SSP then determines if there is any data on the user. If it finds such data, the SSP uses the data to send the ad request off to the ad exchange. Examples of ad exchanges are the DoubleClick Ad Exchange and the Facebook Ad Exchange. In parallel, the ad exchange has been connecting various potential buying systems which include DSPs, networks, and other exchanges. Buy-side systems can give parameters of the types of users the system wishes to target and then only buy ads where data indicates the user fits within those parameters.

14.     By utilizing a DSP, marketers can manage their bids for the banners and the pricing for the data that they are layering on to target their audiences. Using DSPs allows marketers to optimize based on set performance indicators, such as effective cost per click (eCPC), and effective cost per action (eCPA).

15.     DSPs incorporate wide access to inventory and vertical and lateral targeting, with the ability to serve ads, real-time bid on ads, track the ads, and optimize. This is all kept within one interface which creates a unique opportunity for advertisers to truly control and maximize the impact of their ads. The sophistication of the level of detail that can be tracked by DSPs is increasing, including frequency information, multiple forms of rich media ads, and some video metrics.

16.     DSPs are commonly used for retargeting, as DSPs can see a large volume of inventory in order to recognize an ad call with a user that an advertiser is trying to reach. The percentage of bids that are won over the bids that were submitted is called a win rate.

17.     For years, Google has used anticompetitive tactics to maintain and extend its monopolies in the markets for general search services, search advertising, and general search text advertising. Since the advent of ad trading via the Internet, Google has operated the leading exchange for sellers (e.g., publishers like newspapers) and buyers (i.e., advertisers), as well as

1   the leading buy-side software (advertising) and sell-side software (publishing) in the market

2   today.

3        18.   Google's enterprise DSP buy-side software—previously called DoubleClick

4   Bidding Manager or DBM but since renamed DV360—generates the most revenue and has

5   significant growth and that Google "has held a leading position" in the ad serving sellside

6   software market since its acquisition of DoubleClick.

7        19.   Over the past several years, Google leveraged its monopoly in online search and

8   search advertising to acquire an illegal monopoly in brokering display advertising—the

9   placement of advertisements on other companies' websites. Google gained this market

10  dominance, in part, by acquiring rivals in the online advertising space, conditioning access to its

11  search-results data and YouTube video advertising platform upon the purchase of its separate

12  display advertising services, and making its intermediation systems incompatible with those of

13  its competitors. Google's scheme to monopolize the market for brokering display advertising has

14  vastly reduced competition in the purchase and placement of this advertising and resulted in

15  economic harm to advertisers like Plaintiff.

16       20.   For years, Google has entered into exclusionary agreements, including tying

17  arrangements, and engaged in anticompetitive conduct to lock up distribution channels and block

18  rivals. Google pays billions of dollars each year to distributors—including popular-device

19  manufacturers such as Apple, LG, Motorola, and Samsung; major U.S. wireless carriers such as

20  AT&T, T-Mobile, and Verizon; and browser developers such as Mozilla, Opera, and UCWeb—

21  to secure default status for its general search engine and, in many cases, to specifically prohibit

22  Google's counterparties from dealing with Google's competitors. Some of these agreements also

23  require distributors to take a bundle of Google apps, including its search apps, and feature them

24  on devices in prime positions where consumers are most likely to start their internet searches.

25       21.   Google's exclusionary agreements cover just under 60 percent of all general

26  search queries. Nearly half the remaining queries are funneled through Google owned-and-

27  operated properties (e.g., Google's browser, Chrome). Between its exclusionary contracts and

28  owned-and-operated properties, Google effectively owns or controls search distribution channels

    accounting for roughly 80 percent of the general search queries in the United States. Largely as a

---

**CLASS ACTION ANTITRUST COMPLAINT**                                                                 5

result of Google's exclusionary agreements and anticompetitive conduct, Google in recent years has accounted for nearly 90 percent of all general-search-engine queries in the United States, and almost 95 percent of queries on mobile devices.

22.     Google has thus foreclosed competition for internet search. General search engine competitors are denied vital distribution, scale, and product recognition—ensuring they have no real chance to challenge Google. Google is so dominant that "Google" is not only a noun to identify the company and the Google search engine, but also a verb that means to search the Internet.

23.     Google monetizes this search monopoly in the markets for search advertising and general search text advertising, both of which Google has also monopolized for many years. Google uses consumer search queries and consumer information to sell advertising. In the United States, advertisers pay about $40 billion annually to place ads on Google's search engine results page (SERP). It is these search advertising monopoly revenues that Google "shares" with distributors in return for commitments to favor Google's search engine. These enormous payments create a strong disincentive for distributors to switch. The payments also raise barriers to entry for rivals—particularly for small, innovative search companies that cannot afford to pay a multi-billion-dollar entry fee. Through these exclusionary payoffs, and the other anticompetitive conduct described below, Google has created continuous and self-reinforcing monopolies in multiple markets.

24.     Google's anticompetitive practices are especially pernicious because they deny rivals scale to compete effectively. General search services, search advertising, and general search text advertising require complex algorithms that are constantly learning which organic results and ads best respond to user queries; the volume, variety, and velocity of data accelerates the automated learning of search and search advertising algorithms. When asked to name Google's biggest strength in search, Google's then-CEO, Eric Schmidt, explained: "*Scale is the key. We just have so much scale in terms of the data we can bring to bear*." By using distribution agreements to lock up scale for itself and deny it to others, Google unlawfully maintains its monopolies.

25.     Google's practices are anticompetitive under long-established antitrust law. Almost 20 years ago, the D.C. Circuit in *United States v. Microsoft* recognized that anticompetitive agreements by a high-tech monopolist shutting off effective distribution channels for rivals, such as by requiring preset default status (as Google does) and making software undeletable (as Google also does), were exclusionary and unlawful under Section 2 of the Sherman Act.

26.     Back then, Google claimed Microsoft's practices were anticompetitive. Yet, now, Google deploys the same playbook to sustain its own monopolies. However, Google did learn one thing from Microsoft—to choose its words carefully to avoid antitrust scrutiny. Referring to a notorious line from the *Microsoft* case, Google's Chief Economist, Hal Varian, wrote: "*We should be careful about what we say in both public and private. 'Cutting off the air supply' and similar phrases should be avoided*." Moreover, as has been publicly reported, Google's employees received specific instructions on what language to use (and not use) in emails because "Words matter. Especially in antitrust law." In particular, Google employees were instructed to avoid using terms such as "bundle," "tie," "crush," "kill," "hurt," or "block" competition, and to avoid observing that Google has "market power" in any market.

27.     Absent a court order, Google will continue executing its anticompetitive strategy, crippling the competitive process, reducing consumer choice, and stifling innovation. Google is now the unchallenged gateway to the Internet for billions of users worldwide. As a consequence, countless advertisers must pay a toll to Google's search advertising and general search text advertising monopolies; American consumers, like Plaintiff, are forced to accept Google's policies, privacy practices, and use of personal data; and new companies with innovative business models cannot emerge from Google's long shadow. For the sake of American consumers, advertisers, and all companies now reliant on the internet economy, the time has come to stop Google's anticompetitive conduct.

28.     Because of its pervasive monopoly conduct, Google now controls the "ad tech stack," comprising the intermediary services between advertisers, which pay to place digital advertisements, and publishers, who are paid to publish those ads on their websites. Companies that wish to place or publish online advertisements have little choice but to pay Google for its

advertising services, including instantaneous auctions, and Google's exclusion of competition in this intermediation market has enabled it to favor its own advertising platforms. Google's extraction of monopoly rents through fees charged to both advertisers and publishers has resulted in higher prices paid by advertisers, higher consumer prices, and lower payments to publishers of online display advertisements.

29.     Like the other class members, Plaintiff dealt directly with Google in its capacity as display advertising broker, placed online display and search advertisements using Google's services. Plaintiff, like the other class members, is a direct purchaser that suffered economic losses as a result of Google's monopolization and seeks appropriate equitable relief and damages through this action.

30.     There are also high barriers to entry in these markets, in part because of network effects: the more consumers use a search engine, the more attractive it becomes to advertisers. The profits generated can then be used to attract even more consumers. Similarly, the data a search engine gathers about consumers can in turn be used to improve results. Market dominance is, as such, not illegal under antitrust rules. However, dominant companies have a special responsibility not to abuse their powerful market position by restricting competition, either in the market where they are dominant or in separate markets. Otherwise, there would be a risk that a company, once dominant in one market (even if this resulted from competition on the merits), would be able to use this market power to cement/further expand its dominance or leverage it into separate markets.

31.     Moreover, Google strengthened and expanded its market dominance in the general internet search through the creation of a separate and distinct portion of its SERP by giving a separate Google product (initially called "Froogle," re-named "Google Product Search" in 2008 and "Google Shopping" in 2013) an illegal advantage in the separate comparison-shopping market.

32.     Google systematically and intentionally gave prominent placement to its own comparison-shopping service, Google Shopping, and products contained therein. Google's comparison-shopping results are displayed, in a rich format, at the top of the search results, or sometimes in a reserved space on the right-hand side. They are placed above the results that

1   Google's generic search algorithms consider most relevant. This happens whenever a consumer
2   types a product-related query into the Google general search engine, in relation to which Google
3   wants to show comparison shopping results. This means that Google's comparison-shopping
4   service is not subject to Google's generic search algorithms.  Moreover, Google uses its
5   comparison-shopping service in a predatory and exclusionary manner by, inter alia, unilaterally
6   prohibiting, precluding, and/or suspending ads by businesses and/or entities that are attempting
7   to market/sell similar products.

8        33.    Rival comparison-shopping services are subject to Google's generic search
9   algorithms, including demotions (which lower a search entry's rank in Google's search results).
10  Comparison-shopping services are prone to be demoted by at least two different algorithms,
11  which were first applied in 2004 and 2011, respectively. Evidence shows that even the most
12  highly ranked rival comparison-shopping service appears on average only on page four of
13  Google's search results, and others appear even further down. In practice, this means consumers
14  very rarely see rival comparison-shopping services in Google's search results.

15       34.    Relevant product markets, for the purposes of this case, are, *inter alia*, the market
16  for general search services and the market for comparative purchasing services.  For the purposes
17  of this case, these relevant markets are nationwide. The provision of general search services
18  constitutes a differentiated product market, since: (a) it constitutes an economic activity; (b) there
19  is little substitutability of demand and little substitutability of supply between general search
20  services and other online services, and (c) this conclusion does not change when considering
21  general search services on static devices versus mobile devices. The provision of comparative
22  purchasing services constitutes a different reference product market, because the comparative
23  shopping services are not interchangeable with the services offered by: (i) specialized search
24  services in different fields (such as, for example, flights, hotels, restaurants, or news); (ii) online
25  search advertising platforms; (iii) e-commerce retailers; (iv) trading platforms, and (v) offline
26  price comparison tools.

27       35.    Google is and, for years has been, in the dominant position in the U.S. general
28  search market. This conclusion is based on Google's market shares, the existence of barriers to
    expansion and entry, the fact that users use multiple general search engines at the same time

1    (multi-homing) infrequently, the existence of effects of brand, and the lack of countervailing

2    bargaining power of users. The conclusion is valid despite the fact that general search services

3    are offered free of charge and regardless of whether general search on static devices constitutes a

4    different market than general search on mobile devices.

5        36.    Google has and continues to abuse the relevant markets for general search

6    services by positioning and displaying more favorably, on its general search results pages, its

7    own comparison-shopping service compared to those of the competition. Google's conduct is

8    abusive because it diverts traffic flows from competing comparison-shopping services to its own

9    comparison-shopping service, in the sense that it reduces the traffic of comparative-shopping

10   services from its search results pages.

11       37.    By design, Google more favorably positions and displays its own comparison-

12   shopping service on its general search results pages compared to competitors' comparison-

13   shopping services. Google uses specific algorithms that make the competitive comparative-

14   shopping services more likely to be downgraded on Google's general search results pages, which

15   in turn has negatively influenced ranking.  The net result of Google's practices is that users tend

16   to click more times on the links that are more visible on the SERP to the detriment and/or

17   exclusion of competitors and/or other comparison-shopping services.

18       38.    Google cannot provide credible evidence to show that its behavior is essential to

19   achieve efficiencies, as well as that there is no less anti-competitive alternative conduct that is

20   likely to produce the same effects of efficiency. Furthermore, Google has not and cannot provide

21   legitimate arguments or evidence to show the efficiencies achieved by such conduct are likely to

22   outweigh the potential negative effects on competition and consumer welfare in the affected

23   markets.

24   **II.    <u>JURISDICTION</u>**

25       39.    This Court has jurisdiction over this action pursuant to Sections 1331, 1337(a),

26   and 1367 of Title 28 of the United States Code (28 U.S.C. §§ 1331, 1337(a), and 1367). The

27   anticompetitive conduct alleged herein has been directed at Google's violations of Section 2 of

28   the Sherman Act, 15 U.S.C. § 2. This Court also has diversity jurisdiction over this action under

the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is

---

**CLASS ACTION ANTITRUST COMPLAINT**                                                    10

1  of diverse citizenship from Defendants, there are more than 100 class members nationally, and

2  the aggregate amount in controversy exceeds $5,000,000.

3      40.    This Court has *in personam* jurisdiction over Defendants because Defendants,

4  directly and/or through their ownership or control of subsidiaries: (a) transacted business in the

5  United States, including in this District; (b) had substantial aggregate contacts with the United

6  States, including this District; and/or (c) engaged in anticompetitive acts that were directed at,

7  and had a direct, substantial, and reasonably foreseeable and intended effect of injuring, the

8  business or property of persons and entities residing in, located in, or doing business throughout

9  the United States, including in this District. Defendants conduct business throughout the United

10  States, including in this District, and have purposefully availed themselves of the laws of the

11  United States.

12      41.    Venue is proper in this District pursuant to Sections 15 and 22 of Title 15 of the

13  United States Code (15 U.S.C. §§ 15 and 22) and Sections 1391(b) and (c) of Title 28 of the

14  United States Code (28 U.S.C. § 1391(b) and (c)) because a substantial portion of the affected

15  interstate trade and commerce was carried out in this District. Defendants have transacted

16  business, maintained substantial contacts, and/or committed overt acts in furtherance of the

17  illegal restraint of trade throughout this District.

18  **III.**    **PARTIES**

19      **A. PLAINTIFF**

20      42.    Plaintiff Organic Panaceas, LLC, is Louisiana Limited Liability Company which

21  maintains its headquarters in New Orleans, Louisiana. Beginning in November 2016, Plaintiff

22  sold various products online at www.ophempoil.com, www.drjohnsremedies.com,

23  www.johnsoilstore.com, and on a few other sites. Importantly, these sites were Plaintiff's only

24  storefronts and Plaintiff did not have any "brick-n-mortar" stores.

25      43.    Plaintiff predominately sold Hemp Oil containing cannabidiol or CBD. Plaintiff

26  specifically acknowledges that, arguably, there are/were potential issues associated with the

27  marketing and sale of products containing CBD. However, such issues are not at issue herein

28  because Plaintiff was injured by, and as a result of, Google's intentional predatory and

    exclusionary manipulation of its internal policies. Specifically, Google suspended Plaintiff's

---

**CLASS ACTION ANTITRUST COMPLAINT**           11

advertising accounts, in light of its policy, while at the same time it sold the same and/or similar products through its Google Shopping Service and allowed Plaintiff's competitors to place paid ads in premium positions, in the face of its policy.

44.    Plaintiff attempted to market its site through Google Adwords, because Google was the largest general and paid search engine on the Internet. The paid ads were initially very successful. The ads yielded more than 1,000 site visitors day after day while sales grew proportionately, albeit slower. Subsequently, Google unilaterally suspended Plaintiff's ads because the site purportedly "violated a Google policy which prohibited paid ads for products containing CBD." The traffic and sales on the Dr. Johns' site, for example, immediately dropped precipitously. The number of visitors to the site dropped from 1,500 to 2,000 per day to 10 or less and the sales dropped to zero, notwithstanding the word-of-mouth sales that Plaintiff was able to create.

45.    When Plaintiff discovered that its site was suspended, it contacted Google, stating it seemed "arbitrary and capricious" and/or exclusionary and/or predatory to suspend Plaintiff's paid ads while, at the same time, Google was allowing numerous other paid ads for entities/websites selling the same or very similar products. Google assured Plaintiff that it rigidly enforced its policy at issue. Plaintiff responded by sending Google screenshots of SERP's depicting paid ads from sites selling products containing CBD. Specifically. Plaintiff sent a screenshot which showed that, *inter alia*, Amazon and Target had/were running paid ads for products containing CBD, and asked Google to enforce the same policy against Amazon and Target by disabling their respective website(s) from any and all of the Google paid ads, regardless of whether the ads refer to a CBD containing product. The paid ads from Target were subsequently discontinued, while the paid ads from Amazon were not.

46.    By design, Google's comparison-shopping service, "Google Shopping," took up the first 15 to 25 percent of the SERP.  These products featured therein were specifically demarcated on the SERP with/by a group of boxes that each contained a product.  The products featured by "Google Shopping" were further highlighted and/or set off by Google's introductory statement, "Shop for [search query] on Google."  This statement became personalized to the search to the extent that Google's algorithm filled the blank with the respective terms of the

search query. The design and intent of showing the items in boxes with the introductory statement are designed to convey to the consumer the belief that Google had vetted and was recommending the respective products, which thereby made them the best option for purchasing.

47.    The SERP featured a grey button next to the term sponsored.  When this button was pushed, a box popped up which stated:

> Based on your search query, we think you are trying to find a product. Clicking in this box will show you results from providers who can fulfill your request. Google may be compensated by some of these providers. Prices do not include shipping costs.

This statement clearly shows that Google is being compensated for recommending CBD containing products to the person(s) that performed the search.

48.    An example is the November 17, 2017 search for "where to buy CBD oil for pain" which resulted in the following SERP, **<u>Figure 1</u>**:



This SERP shows the Google Shopping Area that refers visitors to "Shop for where to buy hemp cbd o… on Google" and various Hemp and Cannabis products. This SERP also shows the premium placement of Amazon's paid ad, "Shop Hemp CBD Pain," after Plaintiff's ad was suspended.

49.    This SERP clearly shows Google was effectively in the business of selling CBD products in violation of its own policy since it is being compensated for the sale of products containing CBD. Google clearly cannot use its purported "policy" as a means to exclude Plaintiff

from advertising while Google sells the same/similar products and/or from allowing other sellers to run paid ads for the same/similar products.

50.    "Monopoly power" is the ability to control prices and output or to exclude competitors from the market. Google has monopoly power with regard to the paid advertising market on, *inter alia*, its platform. Google regularly, arbitrarily, and/or intentionally engaged in the unlawful conduct complained of herein that proximately and directly caused Plaintiff to sustain serious financial losses. All of the members of the class experienced the same type of financial and business losses as did Plaintiff. These losses were the exact type of business and financial losses that the antitrust laws were intended to prevent.

51.    Plaintiff sustained antitrust injury by, *inter alia*, paying supra-competitive prices to Google to broker the placement of its display advertisements on third-party websites These anticompetitive overcharges directly and proximately resulted from Google's monopolization of the relevant market.

## B. Defendants

52.    Defendant Google LLC is a wholly owned subsidiary of Alphabet Inc. Google is a limited liability company organized and existing under the laws of the State of Delaware, and is headquartered in Mountain View, California. Google engages in, and its activities substantially affect, interstate trade and commerce. Google provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally.

53.    Google is owned by Defendant Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California. Essentially, in 2015, the company formerly known as Google was renamed Alphabet Inc. and then Google LLC became a subsidiary of Alphabet. Alphabet engages in, and its activities substantially affect, interstate trade and commerce. Alphabet provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally.

54.    Google LLC and Alphabet Inc. are collectively referred to herein as "Google."

1   **IV.     FACTUAL ALLEGATIONS**

2       **A.   SEARCH ENGINES, SEARCH ADVERTISING, AND GENERAL SEARCH TEXT**
3           **ADVERTISING**

4       55.     In the early 1990s, computer scientists and entrepreneurs explored different ways
5   to search and index the growing number of internet sites. The first computer program or general
6   "search engine" that could perform this task was designed in 1990 by a student at McGill
7   University in Montreal and called "Archie." Other early general search engines emerged, with
8   different methods of gathering, organizing, and presenting information about internet sites.
9   Google's founders launched their research project "Backrub" on Stanford University's network
10  in 1996.

11      56.     When a search user enters a query into a general search engine, the software uses
12  algorithms to evaluate the relevance of information on any given webpage to the user's query.
13  Depending on the query, some general search engines may also search selected proprietary
14  databases for pertinent information to offer additional "specialized" search results. The general
15  search engine then delivers the results on the SERP, with links to, and short descriptions of,
16  webpages the algorithm has curated and ranked. Sometimes, the general search engine will serve
17  ads with the search results.

18      57.     Given the Internet's enormous breadth and constant evolution, establishing and
19  maintaining a commercially viable general search engine is an expensive process. Google's
20  search index contains hundreds of billions of webpages and is well over 100,000,000 gigabytes
21  in size. Developing a general search index of this scale, as well as viable search algorithms,
22  would require an upfront investment of billions of dollars. The costs for maintaining a scaled
23  general search business can reach hundreds of millions of dollars a year.

24      58.     General search engines are "one-stop shops" consumers can use to search the
25  Internet for answers to a wide range of queries. The United States has only three general search
26  engines that crawl the internet: Google, Bing, and, to a lesser extent, privacy-focused search
27  provider DuckDuckGo. DuckDuckGo combines search results from different sources (including
28  Bing) depending on the search query. A fourth general search engine, Yahoo!, does not currently
crawl the Internet and instead purchases search results from Bing.

**CLASS ACTION ANTITRUST COMPLAINT**                                              15

59.     Consumers can find certain specialized information online using sources other than general search engines. For example, consumers can search retail marketplaces such as Amazon or eBay to shop for products or go to Expedia or Priceline to compare airfares. Search sites that offer users a narrower, focused set of answers to queries are "specialized search engines." Specialized search engines are often able to give users deeper topical results than general search engines by using specialized data or information gathered from users or supplied by third parties.

60.     Most general search engines do not charge a cash price to consumers. At least one, Bing, even offers to pay consumers rewards for using its general search engine. That does not mean, however, that these general search engines are free. When a consumer uses Google, the consumer provides personal information and attention in exchange for search results. Google then monetizes the consumer's information and attention by selling ads.

61.     Some specialized search providers also sell search ads. For example, advertisers can buy specialized search ads for goods sold on Amazon, hotels presented on Expedia, and local services listed on Yelp. As the number of users of a general search engine grows, advertisers benefit because they want their marketing campaigns to reach large groups of consumers. Yet users do not benefit from indirect network effects in an equivalent way. As Google's Chief Economist, Hal Varian, explained, "users do not decide which search engine to use based on the number of advertisers."

62.     Scale is also important for search advertising because advertisers pay more to buy ads from a search provider with a large audience of potentially interested customers. Google can deliver enormous audiences, especially in mobile, which its competitors cannot. Google's scale also enables it to better discern which ads are most relevant for which queries.

63.     Further, to recoup the large investment in creating and maintaining a general search engine, scale is critical to generating the necessary revenues and profits. Even a competitor that syndicates its search results from other general search engines must make substantial investments to compete. The most effective way to achieve scale is for the general search engine to be the preset default on mobile devices, computers, and other devices, as described in more detail below.

64.     Search is like many other businesses in that the owners of general search engines can benefit greatly from a network of distributors to get their products to consumers. Distribution of general search engines takes place primarily through search access points, such as browsers and search apps, typically located on mobile devices and computers. More recently, searches have become available on IoT devices.

65.     General search service providers can enter into agreements with various distributors, including computer and mobile-device manufacturers, cell phone carriers, and browser developers, to secure preset default status on computer and mobile-device search access points.

66.     New computers and new mobile devices generally come with a number of preinstalled apps and out-of-the-box settings. Computers and mobile devices generally have apps preinstalled that include search access points, such as browsers, search apps and widgets, and voice assistants. Mobile devices may also have hardware features—such as a home button triggering a voice assistant—that a consumer can use to invoke apps with search functionality. Each of these search access points can, and almost always does, have a preset default general search engine. Being the preset default general search engine is particularly valuable because consumers rarely change the preset default.

67.     With roughly 60 percent of searches, mobile devices represent the largest and, over the last five years, fastest growing search distribution channel. In the United States, Apple iOS devices—those running on Apple's proprietary mobile operating system—account for roughly 60 percent of mobile-device usage. Apple's iOS is a closed ecosystem; Apple does not license its iOS to third-party mobile-device manufacturers. Another roughly 40 percent of mobile-device usage comes from devices that use Android, an open-source mobile operating system controlled by Google. Unlike iOS, Android is licensable, which means third-party mobile-device manufacturers can use it as the operating system for their devices. All other mobile operating systems, combined, account for less than one percent of mobile-device usage in the United States.

68.     General search services can be delivered to mobile-device users through a variety of search access points, including: (a) a browser; (b) a static search bar (search widget, referred

**CLASS ACTION ANTITRUST COMPLAINT**                                    17

1   to in Figure 4 below as the quick search box or QSB) on the device's home screen, (c) a search

2   app, (d) artificial intelligence software (voice assistants) accessed by a button or voice command

3   and designed to answer voice-initiated queries, and (e) other apps that link to general search

4   engines, such as smart keyboards. **Figure 2**, below, from a 2018 Google strategy deck, provides

5   a more specific breakdown of how Google delivers its general search service on Android device.



18      69.     In the United States, both cell phone carriers and manufacturers sell mobile

19   devices. As discussed above, these phones or tablets typically have search access points preset

20   with a general search engine as the default. These preset defaults are usually governed by a

21   distribution or licensing agreement. For instance, Google has contracted with Apple for many

22   years to preset Google's search engine as the default for Apple's Safari browser and, more

23   recently, other search access points on Apple's mobile devices. When a consumer takes a new

24   iPhone or iPad out of its box, all the significant access points default to Google as their general

25   search provider. Indeed, Google has preset default status for an overwhelming share of the search

26   access points on mobile devices sold in the United States.

27      70.     When using a computer, most consumers access a general search engine through a

28   browser, either by (a) typing a query directly into the address bar at the top of the browser, or (b)

visiting a general search engine web page and entering a query. Many browsers default to a

general-search-engine web page as the home or start screen each time a user activates the browser; this offers users a convenient way to start their search experience.

71.     In the United States, Google Chrome is the leading computer browser, with almost 60 percent market share. Apple's Safari browser has approximately 16 percent share on computers. Mozilla's Firefox has approximately 7 percent share, and Microsoft's Edge and Internet Explorer together have approximately 15 percent share. Other small browsers have a combined share of less than 4 percent. With the exception of Microsoft, most browser developers have agreed with Google to preset its search engine as the default search provider.

72.     Preset default settings are important for computers. Consumers may not understand that they can change the browser's preset default general search engine, or consumers may not bother to invest the time to make such a switch. For both mobile and computer search access points, being preset as the default is the most effective way for general search engines to reach users, develop scale, and become or remain competitive.

73.     General search services providers typically enter into licensing and distribution agreements with manufacturers and carriers that distribute mobile devices with search access points. In the United States, roughly 60 percent of all search queries are covered by Google's exclusionary agreements. On mobile devices, Google's exclusionary agreements cover more than 80 percent of all U.S. search queries.

74.     Of the remaining search queries not covered by Google's exclusionary contracts, almost half take place on search access points owned by Google. Google is a vertically integrated search provider and distributes search in part through several of its own properties, including for example its browser (Chrome) and phone (Pixel). Between its exclusionary contracts and owned-and-operated properties, Google effectively owns or controls search distribution channels accounting for roughly 80 percent of the general search queries in the United States.

75.     Google's distribution agreements come in three basic types, with the specific terms of each agreement depending upon the counterparty and the search access points at issue. First, Google requires Android device manufacturers that want to preinstall Google's proprietary apps to sign an anti-forking agreement. These agreements set strict limits on the manufacturers' ability to sell Android devices that do not comply with Google's technical and design standards.

76.     Next, for Android device manufacturers that sign an anti-forking agreement, Google provides access to its vital proprietary apps and application program interfaces (APIs) for preinstallation, but only if the manufacturers contractually agree to (a) take a bundle of other Google apps, (b) make certain apps undeletable, and (c) give Google the most valuable and important real estate on the default home screen.

77.     Finally, Google provides a share of its search advertising revenue to Android device manufacturers, mobile phone carriers, competing browsers, and Apple. In exchange, Google becomes the preset default general search engine for the most important search access points on a computer or mobile device. As a practical matter, users rarely switch the preset default general search engine. In many cases, the agreements relating to mobile devices go even further, expressly prohibiting (a) the preinstallation of any rival general search services, and (b) the setting of other defaults to rival general search engines. This means that Google is the only preset default search provider preinstalled on the device.

78.     These agreements work exactly as Google designed them—to foreclose distribution to Google's search rivals, weakening them as competitive alternatives for consumers and advertisers by denying them scale.

79.     Google's anticompetitive agreements must be understood against the backdrop of Google's overall business strategy. When Google was formed and achieved initial success in the late 1990s and early 2000s, internet searches were almost exclusively performed through browsers on computers. But as Google told investors in its 2007 Form 10-K: "More individuals are using non-desktop devices to access the internet. If users of these devices do not widely adopt versions of our web search technology, products or operating systems developed for these devices, our business could be adversely affected."

80.     One method was utilizing Android, a mobile operating system that Google purchased in 2005. In 2007, Google released the Android code for free under an open-source license. Being "open source" means that anyone can access the source code and use it to make their own, modified operating system—a "fork." This was key to Android's adoption.

81.     Once enough major distributors agreed to use Android, the operating system attracted developers looking for wide distribution of their apps. As more app developers focused

their efforts on designing Android apps, Android became more attractive to consumers, which in turn led even more developers to design for Android. The result was a must-have ecosystem of Android apps.

82.     To help the Android ecosystem achieve critical mass and to advance the network effects, Google "shared" its search advertising and app store revenues with distributors as further inducement to give up control. Beginning over ten years ago, Google used revenue sharing to attract partners to Android and Google uses revenue sharing to keep these partners locked in today.

83.     By 2012, the Android operating system had quickly become the dominant licensable mobile operating system in the United States. In the four years between 2009 and 2012, Android's share of licensable mobile operating systems on smartphones in the United States more than tripled, reaching about 80 percent. Today, Android represents over 95 percent of licensable mobile operating systems for smartphones and tablets in the United States and accounts for over 70 percent of all mobile device usage worldwide. The only other mobile operating system with significant market share in the United States is Apple's iOS, which is not licensable.

## B.  OVERVIEW OF DIGITAL ADVERTISING

84.     Advertisers use various types of ads to achieve different objectives. Marketers and advertisers typically refer to a "purchase funnel" or "customer acquisition funnel" to describe the average consumer's various states of mind leading up to a potential purchase, and the type of advertising most effective at each state. **Figure 3** is an illustration of the purchase funnel:



The Consumer Purchase Funnel

Ad Recall
Brand Awareness
Brand Interest
Consideration
Favorability
Intent
Purchase

85.     Search ads enable advertisers to target potential customers based on keywords entered by these users, at the exact moment users express interest in the topic of the queries. For this reason, search ads are lower in the purchase funnel—closer to the consumer's ultimate intent to make a purchase—than other types of ads that are primarily intended to drive brand awareness. The ability of search ads to provide advertising based on a consumer's self-disclosed interests, when the consumer is actively seeking information, makes search ads uniquely valuable to advertisers.

86.     In 2000, search advertising first appeared on Google. During that same year, Google launched AdWords, its buying platform for search ads. Two years ago, Google rebranded AdWords as Google Ads. In 2002, to sell ads on its SERP, Google adopted auctions for keywords; advertisers would bid on selected keywords, and when those keywords arose in a query, the winning bidder's ad was shown. At that time, Google also started using a compensation scheme where advertisers pay only when the user clicks on the ad, known as cost-per-click pricing. Some SERP displayed multiple ads. Eventually, Google discovered that it could increase the number of clicks—and its own profits—by ranking ads to promote those with greater relevance and therefore higher expected click-through rates. To help determine placement of ads, Google still uses a "quality score" based on various factors.

87.     Historically, general search engines such as Google sold only general search text ads. General search text ads resemble the organic search results that appear on a SERP—what Google refers to as the "10 blue links"—but with a subtle notation that they are "ads" or "sponsored." Google describes its text ads as containing a headline text, a display URL, and a description text. **Figure 4** is an example of the paid text ads that were being run by Plaintiff:

Dr. Johns Pure Organic
Hemp Oil – Potency and
Purity Guaranteed

Drjohnsremedies.com

Demand the Purest, Demand
Demand Dr. John's
Featured at the ESPY
Swag Bag Suite

1
2

    C. **Google Used Its Market Power to Acquire and Maintain a Monopoly for Display Advertising Services**

3
4

    88.    Google leveraged its dominance in search and search advertising and its control of user's data to gain a monopoly in brokering display advertising.

5
6
7
8
9

    89.    Barriers to entry in the search advertising market, among other factors, protect Google's monopoly in that market. Most critically, search advertising requires a search engine with sufficient scale to make the advertising profitable. Hence, the same entry barriers that fortify Google's general search services monopoly also protect Google's search advertising monopoly.

10
11
12

    90.    In response to a user's query on Google Search, Google's general search results pages may also return search advertisements drawn from Google's auction-based online search advertising platform, AdWords ("AdWords results").

13
14
15
16
17

    91.    AdWords results are not limited to specific categories of products, services, or information. AdWords results typically appear on general search results pages above or below generic search results with a label informing users of their nature as advertisements (for example, "Ads"). AdWords results can be purchased by any advertiser and are not limited to particular categories of advertisers.

18
19
20
21
22
23
24
25
26
27

    92.    The appearance of AdWords results in response to a user's query involves two main elements. First, AdWords identifies a pool of relevant search advertisements by matching the keywords on which advertisers have associated their search advertisements with the keywords used in the query. Second, AdWords ranks the relevant search advertisements within the pool based on their "Ad Rank." The ranking of a search advertisement depends on two factors: the maximum price an advertiser indicated it is willing to pay for each click on its search advertisement auction, and the quality rating of that search advertisement (known as "Quality Score"). The Quality Score is based among other things on a search advertisement's predicted click-through rate. AdWords results that appear the most visibly on Google's general search results pages are those with the highest Ad Rank scores.

28

    93.    When a user clicks on an AdWords result, Google receives remuneration for that click from the advertiser owning the website to which the user is directed (known as the "pay per

click" system). AdWords results allow advertisers to lead interested users entering queries on Google Search to their websites, including in circumstances where these websites would otherwise not rank highly in generic search results on Google's general search results pages. Specialized search services competing with services provided by Google often also purchase AdWords results.

94.     In response to a user query, Google's general search results pages may also return specialized search results from Google's specialized search services. In most instances, specialized search results are displayed with attractive graphical features, such as large-scale pictures and dynamic information. Specialized search results in a particular category are positioned within sets referred to by Google as "Universals" or "OneBoxes." These specialized search results are, in most instances, positioned above generic search results or among the first of the results.

95.     Google operates several search services that can be described as "specialized" because these specialized search results group together results for a specific category of products, services, or information (for example, "Google Shopping," "Google Finance," "Google Flights," or "Google Video"). In addition to the results returned in "Universals" or "One Boxes," Google's specialized search services can also be accessed through menu-type links displayed at the top of Google's search results pages.

96.     Certain of Google's specialized search services are based on paid inclusion. Third party websites have to enter into an agreement with Google in order to be listed in the search results of such a specialized search service. In most instances, such an agreement provides for a payment based on a pay per click system.

97.     Google has systematically given prominent placement to its own comparison-shopping service. Google's comparison-shopping results are displayed, in a rich format, at the top of the search results, or sometimes in a reserved space on the right-hand side. Google's comparison-shopping results are placed above the results that Google's generic search algorithms consider most relevant. This placement happens whenever a consumer types a product-related query into the Google general search engine, in relation to which Google wants

to show comparison shopping results. This means that Google's comparison-shopping service is not subject to Google's generic search algorithms.

98.     On the other hand, rival comparison-shopping services are subject to Google's generic search algorithms, including demotions (which lower a search entry's rank in Google's search results). Very often, comparison shopping services are prone to be demoted by at least two different algorithms, which were first applied in 2004 and 2011, respectively. Even the most highly ranked rival comparison-shopping service appears on average only on page four of Google's search results, and others appear even further down. In practice, this means consumers very rarely see rival comparison-shopping services in Google's search results.

99.     Google has leveraged its market dominance in general internet search into a separate market: comparison shopping. Google abused its market dominance as a search engine to promote its own comparison-shopping service in search results, whilst demoting those search results of rivals.

100.     Appearance in Google's search results impacts on user clicks/traffic: Real-world consumer behavior, surveys, and eye-tracking studies demonstrate that consumers generally click far more on search results at or near the top of the first search results page than on results lower down the first page, or on subsequent pages, where rival comparison-shopping services were most often found after demotion.

101.     In fact, even on desktops, the ten highest-ranking generic search results on page 1 together generally receive approximately 95 percent of all clicks on generic search results (with the top search result receiving about 35 percent of all the clicks). The first result on page 2 of Google's search results receives only about 1 percent of all clicks. The effects on mobile devices are even more pronounced given the much smaller screen size. Moving the first result to the third rank leads to a reduction in the number of clicks by about 50 percent.

102.     Since the start of the abuse, Google's comparison-shopping service has made significant gains in traffic, while rival comparison-shopping services have suffered a decrease in traffic from Google's search results pages on a lasting basis. Google Shopping featured larger product images, the ability to refine searches by brand and/or product type, as well as more dominance in search results, naturally attracting more traffic. Google's comparison-shopping

1    service is one of Google's specialized search services. In response to queries, it returns product

2    offers from merchant websites, enabling users to compare them.

3        103.    In December 2002, Google launched the first version of its comparison-shopping

4    service in the U.S. under the brand name "Froogle." Froogle operated as a standalone website.

5    Merchants did not have to pay to be listed in Froogle as it was monetized by advertisements.  In

6    April 2007, Google renamed Froogle as "Google Product Search" and subsequently launched,

7    along with the standalone Google Product Search website, a dedicated "Universal" or "OneBox"

8    for Google Product Search, referred to as the "Product Universal." Google did not, however,

9    change the business model of its comparison-shopping service: like Froogle, merchants did not

10   have to pay to be listed in Google Product Search as it was monetized by advertisements.

11       104.    The Product Universal comprised specialized search results from Google Product

12   Search, accompanied by one or several images and additional information such as the price of

13   the relevant items. The results within the Product Universal, including the clickable images, in

14   most cases led the user to the standalone Google Product Search websites. There was also a

15   header link leading to the main website of Google Product Search.

16       105.    In May 2012, Google renamed Google Product Search as "Google Shopping" and

17   revamped the Product Universal, which was renamed first "Commercial Unit," and then

18   "Shopping Unit." At the same time, Google also changed the business model of its comparison-

19   shopping service (both the standalone website and the Product Universal) to a "paid inclusion"

20   model, in which merchants pay Google when their product is clicked on in Google Shopping, to

21   more closely reflect the industry standard.

22       106.    In the same way as the Product Universal comprised specialized search results

23   from Google Product Search, the Shopping Unit comprises specialized search results from

24   Google Shopping. Those results are commercially named "Product Listing Ads" (PLAs). Unlike

25   for the Product Universal, however, the results within the Shopping Unit generally lead users

26   directly to the pages of Google's merchant partners on which the user can purchase the relevant

27   item.  In May 2021, the Shopping Unit and the standalone Google Shopping website were first

28   launched in the U.S., with the transition completed by Autumn 2012.

107.    Two of the relevant product markets for the purpose of this case are the market for general search services and the market for comparison shopping services.

108.    The provision of general search services constitutes a distinct product market. First, the provision of general search services constitutes an economic activity. Second, there is limited demand side substitutability and limited supply side substitutability between general search services and other online services. This conclusion does not change if general search services on static devices versus mobile devices are considered.

109.    The provision of general search services constitutes an economic activity. Even though users do not pay a monetary consideration for the use of general search services, users contribute to the monetization of the service by providing data with each query.  In most cases, a user inserting a query enters into a contractual relationship with the operator of the general search service. For instance, Google's Terms of Service provide: "By using our Services, you agree that Google can use such data in accordance with our privacy policies." In accordance with its privacy policies, Google can store and re-use data relative to user queries. The terms and conditions of other providers of general search services contain similar provisions. The data which users agree to allow a general search engine to store and re-use is of value to the provider of the general search service as it is used to improve the relevance of the search service and to show more relevant advertising.

110.    Offering a service free of charge can be an advantageous commercial strategy, in particular for two-sided platforms such as a general search engine platform that connect distinct but interdependent demands. In two-sided platforms, two distinct user groups interact. At least for one of these user groups, the value obtained from the platform depends on the number of users of the other class. General search services and online search advertising constitute the two sides of a general search engine platform. The level of advertising revenue that a general search engine can obtain is related to the number of users of its general search service: the higher the number of users of a general search service, the more the online search advertising side of the platform will appeal to advertisers.

111.   Regarding specifically Google's comparison-shopping service, Google offers that service as a separate standalone service, and describes its functionality and purpose differently to how it describes its general search service.

112.   There is also a dedicated information page about Google Shopping, entitled "About Google Shopping." The page describes Google Shopping as a distinct "product discovery experience": "Google Shopping is a new product discovery experience. The goal is to make it easy for users to research purchases, find information about different products, their features and prices, and then connect with merchants to make their purchase" Google then elaborates on the many search tools that are specific to Google Shopping:

> When you do a search within Google Shopping you'll see a variety of filters (like price, size, technical specifications, etc.) on the left side of the page that can help you quickly narrow down to the right product. You can also choose to display items in either a list or grid view by selecting one of these options in the top right-hand corner above the results. When viewing certain apparel product detail pages (like dresses, coats and shoes), you'll also see items that are "visually similar" to the item you've selected. These are just a few of the many tools within Google Shopping and we look forward to providing more in the future.

113.   Contrary to what Google claims, even though search results provided by a general search service may sometimes overlap with the results provided by a specialized search service, the two types of search services act as complements rather than substitutes. A general search service is the only online search service on which users can seek potentially relevant results from all categories at the same time. Specialized search services offer certain search functionalities that do not exist, or not to the same extent, on general search services. For instance, on search services specialized in travel, users may look for hotels with a certain number of stars, or within a certain range of a city, or they may read user reviews of these hotels. These functionalities are unavailable to the same extent on a general search service for the same queries. A substantial number of users reach to specialized search services only after having first entered a query in a general search service.

114.   There is also limited substitutability between general search services and social networking sites. General search services and social networking sites perform different functions. While general search services help users find content they are looking for, social

networks lead users to content in which they might be interested by offering a means for users to connect and interact with people who, for instance, share interests or activities. While certain social networks offer a general search function on their websites, so that users do not need to leave the sites to perform a general search, none of these sites uses its own general search technology. Instead, they rely on existing third-party search services to power these searches. For example, Facebook previously relied on Microsoft's Bing to provide search results.

115.    Moreover, the volume of general searches performed on social networks represents only a small share of the total volume of general searches. For example, in 2011, the number of general searches performed via Facebook was equivalent to only 3.2 percent of the number of general searches performed on Google Search, even though, at the time, Facebook was by far the largest social network.

116.    General search services offered on static devices, such as desktop and laptop PCs, and on mobile devices, such as smartphones and tablets, belong to the same relevant product market. First, general search services are active on all types of devices. Although the user interface is different, the underlying technology is the same. Second, general search services on static and mobile devices are offered by the same undertakings: (a) online search advertising platforms; (b) online retailers; (c) merchant platforms; and (d) offline comparison-shopping tools.

117.    Comparison shopping services are specialized search services that: (a) allow users to search for products and compare their prices and characteristics across the offers of several different online retailers (also referred to as online merchants) and merchant platforms (also referred to as online marketplaces); and (b) provide links that lead (directly or via one or more successive intermediary pages) to the websites of such online retailers or merchant platforms.

118.    From the supply side perspective, each specialized search service selects and ranks results through specific criteria that rely on dedicated signals and formulas designed to determine the relevance of a particular information type (e.g., price, product information, merchant rating, product popularity, etc.). Moreover, specialized search services mostly select content from a pool of relevant suppliers with whom they have contractual relationships, and

those suppliers must provide input to databases and other data infrastructure operated by specialized search service providers.

119. Therefore, each specialized search service needs to develop and maintain a dedicated data infrastructure and structured relationships with relevant suppliers. Comparison shopping services typically employ a commercial workforce whose role is to enter into agreements with online retailers, pursuant to which these retailers send them feeds of their commercial offers. These services are only partially automated and involve commercial relationships with online retailers. Likewise, flight search services use proprietary databases of content that are usually updated in real-time to ensure that they provide the most current possible information and have contractual arrangements with the booking websites, which remunerate them either by paying a commission per flight ticket booked or on a cost-per-click basis. From the supply side perspective, substitutability is therefore also limited because providers of other specialized search services are not in a position to start providing comparison shopping services in the short term and without incurring significant additional costs.

120. The United States national market for general search services is characterized by the existence of a number of barriers to entry and expansion. First, the establishment of a fully-fledged general search engine requires significant investments in terms of time and resources. For example, each year since at least 2009, Microsoft has invested a significant amount in R&D and capital expenditure in the development and maintenance of the latest version of its general search engine launched in June 2009 under the brand name "Bing." Other companies indicate that the costs associated with the establishment of a fully-fledged general search engine constitute a barrier to entry.

121. Second, because a general search service uses search data to refine the relevance of its general search results pages, it needs to receive a certain volume of queries in order to compete viably. The greater the number of queries a general search service receives, the quicker it is able to detect a change in user behavior patterns and documents update and improve its relevance.

122. A general search service also needs to receive a certain volume of queries in order to improve the relevance of its results for uncommon ("tail") queries. Tail queries are important

1   because users evaluate the relevance of a general search service on a holistic basis and expect to

2   obtain relevant results for both common ("head") and uncommon tail queries The greater the

3   volume of data a general search service possesses for rare tail queries, the more users will

4   perceive it as providing more relevant results for all types of queries.

5       123.    In that regard, there may be diminishing returns to scale in terms of improvements

6   in relevance once the volume of queries a general search service receives exceeds a certain

7   volume. It may also be that the lower success and relevance of a general search service can be

8   explained by other reasons, such as the fact that it does not localize its search results in different

9   countries, that its web index is more limited in depth, or that it is slower in updating its index in

10  order to deliver fresh content to users. Regardless of the veracity of such arguments, however,

11  they remain of limited relevance for the assessment of barriers to entry and expansion on the

12  national markets for general search services because of the underlying fact that a general search

13  service has to receive at least a certain minimum volume of queries in order to compete viably.

14      124.    The relevance of scale is also not called into question by the fact that, in the late

15  1990s, Google was able to overtake the former market leaders, AltaVista and Lycos. At that

16  time, scale was less of a critical factor because the indexing technology of general search engines

17  was not yet able to assess user behavior.

18      125.    Third, general search services constantly invest to improve their product and a

19  new entrant would have no choice but to attempt to match these investments.

20      126.    The existence of positive feedback effects on both sides of the two-sided platform

21  by general search services and online search advertising creates an additional barrier to entity.

22  The positive feedback effects on the online search advertising side are due to the link between

23  the number of users of a general search service and the value of the online search advertisements

24  shown by that general search engine. The higher the number of users of a general search service,

25  the greater the likelihood that a given search advertisement is matched to a user and converted

26  into a sale. This in time increases the price that a general search engine can charge advertisers if

27  their search advertisements are clicked by a user. The general search engine can then reinvest

28  that revenue in seeking to attract new users of its general search service.

127.     As regards the positive feedback effects on the general search side of the general search engine platform, they derive from both direct and indirect network effects. The direct network effects stem from the fact that a substantial minority of users of a general search service derive a benefit from search advertisements. The fact that advertisers are willing to bid for AdWords results on Google's general search results pages is evidence that at least some users value these advertisements.

128.     The indirect network effects stem from the link between the attractiveness of the online search advertising side of a general search engine platform and the revenue of that platform. The higher the number of advertisers using an online search advertising service, the higher the revenue of the general search engine platform; revenue which can be reinvested in the maintenance and improvement of the general search service so as to attract more users Google generates substantial revenues from its online search advertisement business. In the years 2013-2016, Google's advertising revenues rose from $50.6 billion to $79.4 billion.

## V.     INTERSTATE TRADE AND COMMERCE

129.     Google's use of its search engine and digital advertising exchange as part of the digital advertising industry is but one example of how Google unlawfully maintains a monopoly in the market for online search advertising. Google's digital advertising exchange gives its own ad-buying system an unfair competitive advantage over competitors. Google dominates the market for digital ads, beginning with its acquisition of DoubleClick in 2008. Google dominates the market for online search advertising at virtually every step of the process.

## VI.     ANTITRUST IMPACT

130.     Plaintiff was all but put out of business because of Google's monopolistic use of its "policies."

## VII.     CLASS ACTION ALLEGATIONS

131.     Plaintiff brings this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), as representatives of the following class:

> All persons and entities in the United States that, from January 1, 2016 to the present, were excluded from placing ads by and/or as a result of Google's anticompetitive implementation of its "policies and procedures."

Excluded from the proposed class are: Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and court staff assigned to this case.

132.   The proposed class meets the requirements of Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and/or (b)(3).

133.   The members of the class are so numerous that joinder is impracticable. The class includes at least hundreds of thousands of members that are widely dispersed throughout the country.

134.   Plaintiff's claims are typical of the claims of all class members. Plaintiff's claims arise out of a common course of conduct that gives rise to the claims of all other class members. Plaintiff and all class members were and will continue to be damaged in the same manner by the same wrongful conduct, namely Google's unfair business practices and monopolization of the market for display advertising services and all of its component subpart markets.

135.   Plaintiff will fairly and adequately protect and represent the interests of the class.

136.   Plaintiff's interests are coincident with, and not antagonistic to, those of the class.

137.   Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise with antitrust litigation.

138.   Numerous questions of law or fact common to the class arise from Google's course of conduct to exclude competition in the relevant market, including:

a.   Whether Google holds monopoly power in the relevant market;

b.   Whether Google unlawfully acquired and maintained monopoly power in the relevant market;

c.   Whether Google engaged in unfair business practices that reduced competition in the relevant market;

d.   The form and content of injunctive relief to restore competition; and,

e.   The amount of damages owed the class as a result of Google's illegal activity.

139.    Questions of law and fact common to members of the class will predominate over any questions that may affect only individual class members because Google acted on grounds generally applicable to the class as a whole. For the same reason, class certification for purposes of adjudicating Plaintiff's claims for injunctive and declaratory relief is appropriate.

140.    This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

141.    The prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Google.

142.    Plaintiff reserves the right to seek class certification with respect to common issues, including issues related to Google's duties or conduct.

## VIII.    CAUSE OF ACTION

### VIOLATIONS OF THE SHERMAN ANTITRUST ACT 15 U.S.C. § 2

143.    Plaintiff incorporates the allegations set forth above as if fully set forth herein.

144.    The market for digital display advertising and its component subparts and services in the United States are the relevant antitrust markets.

145.    Google has monopoly power in the market for digital display advertising and its component subparts and services in the United States.

146.    Google wrongfully acquired and unlawfully maintained monopoly power in the market for digital display advertising and its component subparts and services in the United States through the overall scheme and conduct alleged herein, including by leveraging its monopoly power in the online search and other markets to coerce the purchase and use of its display advertising services (an unlawful tying arrangement), acquiring rivals, denying interoperability on several technological fronts, restricting competing firms' access to information, using/implementing its "policies" in a predatory and exclusionary manner and rigging auctions that it controlled to its own advantage.

147.   Google's actions were carried out willfully and with the specific intent to acquire and maintain monopoly power in the relevant markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

148.   As a direct and proximate cause of Google's conduct, Plaintiff and members of the class have suffered antitrust injury in the form of economic losses. Those losses constitute antitrust injury, as they are an injury of the type that the antitrust laws were intended to prevent and that flows from what makes Google's monopolistic acts unlawful. But for Google's unlawful exclusionary conduct, competition would have prevailed in the relevant market and Plaintiff and members of the class would not have sustained these losses. Google's conduct also deprived Plaintiff and members of the class of improved quality and innovation in the relevant market.

149.   There is no legitimate pro-competitive justification for Google's anticompetitive conduct and, even if there were, less restrictive alternatives to achieve it would exist.

150.   Plaintiff and members of the class are entitled to equitable relief as appropriate to halt Google's monopoly conduct and restore competition in the relevant market. Members of the class are regular users of display advertising services and will continue to purchase such services and suffer further injury if Google's monopoly is not ended. The primary purpose of such injunctive relief will be to benefit the public from the lower prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Google's monopoly.

151.   Plaintiff and members of the class are entitled to damages, including treble damages, sustained as a result of Google's monopolistic acts and practices.

## IX.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself and the class defined herein, respectfully requests this Court:

A.   Determine this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action be given to the class, appoint Plaintiff as named representative of the class, and appoint the undersigned Plaintiff's counsel as class counsel;

B.   Enter judgment against Google and in favor of Plaintiff and the class;

C.  Enter injunctive relief to restore competition in the relevant market and its constituent submarkets;

D.  Award damages, including treble damages, and/or restitution to the class in an amount to be determined at trial, plus interest in accordance with law.

E.  Award Plaintiff and the class their costs of suit, including reasonable attorneys' fees, as provided by law; and

F.  Award such further and additional relief as is necessary to redress the harm caused by Google's unlawful conduct and as the Court may deem just and proper under the circumstances.

## X.  DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all matters so triable.

Respectfully submitted.

Dated: April 12, 2021                    **GREGORY LAW GROUP**

By:  ___/s/ *Philip L. Gregory*_____
**PHILIP L. GREGORY**
*Attorneys for Plaintiff*